

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

EMILY RIEGEL, et al., )
           **Respondents,** )
            )
v.             )   **WD82279**
            )
DAVID G. JUNGERMAN, et al., )   FILED: December 24, 2019
           **Appellants.** )

### Appeal from the Circuit Court of Jackson County
### The Honorable Kevin D. Harrell, Judge

### Before Division Three: Alok Ahuja, P.J., and
### Gary D. Witt and Anthony Rex Gabbert, JJ.

David Jungerman, his daughter Angelia Buesing, and related entities (collectively "Jungerman") are defendants in an action pending in the Circuit Court of Jackson County, in which the plaintiffs assert wrongful death and fraudulent transfer claims. Jungerman appeals from an interlocutory order in which the circuit court refused to revoke its appointment of a receiver over his property and assets. Jungerman asserts two Points on appeal. First, he argues that he was not provided adequate notice of the plaintiffs' motion for appointment of a receiver, and did not have a meaningful opportunity to be heard before the receiver was appointed. Second, Jungerman argues that the plaintiffs failed to demonstrate that they had a sufficiently mature claim to support appointment of a receiver, because their wrongful death claims had not been reduced to judgment. We affirm.

**Factual Background**

The plaintiffs in the underlying action are Emily Riegel, and husband and wife Allan and JoAnn Pickert. Riegel is the surviving spouse of attorney Thomas Pickert, who was murdered on October 25, 2017. Allan and Joann Pickert are Thomas Pickert's parents. We refer to the plaintiffs collectively as "Riegel."

The current case arises from an earlier personal injury lawsuit brought by Jeffery Harris against David Jungerman in the Circuit Court of Jackson County, *Harris v. Jungerman*, No. 1416-CV22910. Thomas Pickert and his law firm represented Harris in that case. In the *Harris* lawsuit, Harris alleged that Jungerman had unjustifiably shot Harris when Jungerman discovered Harris at a warehouse building owned by Jungerman in the early morning hours of September 25, 2012. Among other injuries, Harris' right leg was amputated below the knee as a result of the shooting.

A jury awarded Harris $750,000 in compensatory damages for battery, and an additional $5 million in punitive damages. The circuit court entered judgment on the jury verdict on August 3, 2017. David Jungerman did not post an appeal bond to secure payment of the *Harris* judgment. Accordingly, while the case was pending on appeal, Thomas Pickert began proceedings against Jungerman to execute on the *Harris* judgment. Jungerman was served with documents related to those execution efforts on October 24, 2017.

On October 25, 2017, after walking his children to school, Thomas Pickert was shot and killed in front of his home. David Jungerman has been charged with first-degree murder and armed criminal action for causing Thomas Pickert's death. *State v. Jungerman*, No. 1816-CR01619-01 (Jackson Cnty. Cir. Ct.). The criminal case is currently pending.

This Court affirmed the judgment against David Jungerman in the *Harris* case in an opinion issued on August 7, 2018. *Harris v. Jungerman*, 560 S.W.3d 549 (Mo. App. W.D. 2018).

On May 17, 2018, Riegel filed her petition in the Circuit Court of Jackson County. Riegel's petition names David Jungerman and his daughter Buesing as defendants, both individually and in their capacities as trustees of the Jungerman Irrevocable Trust and the Jungerman Family Trust.[1] The petition also names the Jungerman Farm Corporation and Baby Tenda Corporation as defendants. We refer to these parties collectively as "Jungerman" in this opinion.

The petition alleges wrongful death claims for battery and negligence against Jungerman for causing the death of Thomas Pickert. The petition also asserts a fraudulent transfer claim, alleging that Jungerman has made various property transfers to hinder or delay his creditors, including Riegel, from collecting on their lawful claims.

The petition alleges that David Jungerman is the owner and sole shareholder of Baby Tenda. The petition further alleges that Baby Tenda, the Farm Corporation, and the Family and Irrevocable Trusts are alter egos of David Jungerman. The petition alleges that, as a result, "any assets held by or fraudulently transferred to or from [the corporations or trusts] constitute a transfer by Jungerman himself . . . ." The petition further alleges that David Jungerman's actions were taken in the course and scope of his employment or agency for the corporations and trusts, and that Jungerman, Buesing, the corporations, and the

---

[1] At the time of the circuit court's order refusing to vacate the receivership, the operative petition named David Jungerman and Buesing as purported trustees of two separate trusts: the Family Trust and the Irrevocable Trust. A First Amended Petition filed on March 29, 2019, modifies these allegations, and alleges instead that Jungerman and Buesing are or were trustees of a single trust: "the Jungerman Family Irrevocable Trust" dated February 17, 2003. The parties have not addressed this discrepancy in their briefing or arguments on appeal, and given our disposition we do not further address it.

3

trusts were acting as a joint venture at all relevant times. Accordingly, the petition alleges that the corporations, trusts, and Buesing are vicariously liable for David Jungerman's actions.

The petition alleges that, shortly after the jury's verdict in the *Harris* case was announced, David Jungerman approached Thomas Pickert in a threatening manner in the courtroom, and told him that "[n]one of this matters. I have 186 guns. I did it once before. I will do it again. You can't touch me." The petition alleges that Jungerman attempted to coerce and intimidate Thomas Pickert and his firm to dissuade them from attempting to collect on the *Harris* judgment. The petition alleges that Jungerman's threats to Thomas Pickert were consistent with a long history of violent and threatening actions. The petition also alleges that, subsequent to Thomas Pickert's murder, Jungerman "admitted to being responsible for the fatal shot 'because a lawyer stole his money.'"

The petition contains detailed allegations concerning property transfers by Jungerman, which the petition alleges were designed to frustrate his creditors. Thus, the petition alleges that, shortly after entry of the *Harris* judgment on August 3, 2017, Jungerman "began, or continued, a scheme to fraudulently transfer assets to hinder, delay, and defraud" present and/or future creditors. The petition alleges the following specific transfers:

- On August 8, 2017, Jungerman ordered a $144,487.63 cashier's check for Buesing from an account at UMB Bank;

- On August 14, 2017, Jungerman deposited a set of checks totaling $4,970,864.39 into the UMB Bank account, and withdrew the same amount three days later;

- Between August 19 and 22, Jungerman opened seven accounts at another bank, and deposited over $250,000 across the accounts;

- On August 24, 2017, Jungerman made a $900,000 deposit into the Irrevocable Trust;

4

- On August 24, 2017, Jungerman made a $1,573,200 deposit into a bank account in the name of the Farm Corporation;

- On August 25, 2017, Jungerman transferred his home and other property to Buesing; and

- On October 12, 2017, Jungerman withdrew $2,100,000 from the Farm Corporation's account and on October 13, 2017, Jungerman withdrew $900,000 from a trust account, in the form of cashier's checks made payable to a title company.

The petition alleges that "[n]one of these financial transactions were made for legitimate business purposes, represented a sale or exchange for reasonably equivalent value, or were made to satisfy some real obligation." Instead, the petition alleges that "Jungerman had moved assets in and around various entities in an attempt to hinder, delay, and/or defraud creditors and future creditors."

The petition prays that the circuit court void and set aside all of Jungerman's fraudulent transfers. The petition further states:

> Based on Defendants' history of fraudulent transfers, [and] the express and complicit participation by all Defendants, Plaintiffs request that a receiver be appointed to take charge and manage Defendants' assets, including the above described bank accounts, the Irrevocable Trust, the Family Trust, the assets [of] Baby-Tenda, the Farm Corporation, any real property owned by Defendants Jungerman and/or Buesing, and any other relief needed that becomes apparent through discovery, and appoint a receiver to control and manage Jungerman's assets.

Jungerman filed a motion to dismiss the petition, and Riegel moved for entry of a default judgment. The circuit court held a hearing on these and other pending motions on August 22, 2018. After hearing argument, the court took the motions under advisement. Riegel then orally requested that the court appoint a receiver because of "the apparent transfer of assets." Riegel's counsel referenced the sworn probable cause statement from Jungerman's criminal case, which described the fraudulent transfers specifically alleged in the petition. The court indicated its intention to appoint a receiver, but directed the parties to brief the issue.

5

The day after the hearing, Riegel filed a proposed order appointing a receiver. On the same day, Jungerman filed an objection to the appointment of a receiver.

On August 29, 2018, the circuit court entered an order appointing a receiver "to take charge over all of the Defendants' property and assets." The court took judicial notice of the probable cause statement filed in the pending criminal case against Jungerman. Based on the evidence and the allegations in Riegel's petition, the court found that "the facts presented show the existence of conduct on the part of Defendants which constitutes a great emergency and places this matter in an urgent posture sufficient to require and justify the appointment of a receiver immediately to take charge of, manage, preserve, and protect the assets of the Defendants."

On September 4, 2018, Jungerman filed a motion to vacate and revoke the order appointing a receiver. In her opposition, Riegel submitted excerpts of testimony by Jungerman and a former employee from the *Harris* trial, in which the witnesses described additional transactions involving Jungerman's property or assets between the time of the Harris shooting and the trial. Thus, the testimony indicated that, shortly after Jungerman shot Harris, Jungerman granted the employee a life estate in a 425-acre property that is worth over $1 million, without the employee's knowledge, and granted the remainder interest to his granddaughter. The testimony also indicated that Jungerman transferred 5,000 acres of farmland to the Jungerman Family Trust. Shortly after Jungerman was sent a request for financial information in the *Harris* case, he removed himself as trustee of the Jungerman Family Trust and Buesing became the trustee.

On October 12, 2018, the court heard argument regarding the motion to revoke the order appointing a receiver. At the hearing, Riegel argued that the probable cause statement,

combined with the testimony of Mr. Jungerman in the Harris trial[,] . . . shows that his motive and intent was to move this money around to avoid – to essentially make him judgment-proof from the existing creditors in the Harris lawsuit, including Thomas Pickert and his family members, who now have a claim for the wrongful death that resulted from Mr. Jungerman's actions.

On October 19, 2018, the court entered an order denying Jungerman's motion to revoke the order appointing a receiver. Jungerman had also moved to disqualify the receiver initially appointed by the circuit court on the ground that the receiver was a member of the Kansas City Board of Police Commissioners, and therefore had a conflict of interest because of the pending criminal charges against Jungerman for Thomas Pickert's murder. In its October 19 order, the court stated its view that no conflict of interest existed. Nevertheless, in light of Jungerman's objections, the court appointed a new receiver.

Jungerman appeals.[2]

We note that, during the briefing of this appeal, the Farm Corporation filed a voluntary bankruptcy petition on May 16, 2019. *In re Jungerman Farm Corp.*, No. 19-4157-drd11 (Bankr. W.D. Mo.). As a result, this Court stayed further proceedings. The bankruptcy case was dismissed without prejudice on August 28, 2019, and briefing resumed.

We also note that, although all of the defendants initially joined in the Notice of Appeal, Buesing and the Jungerman Farm Corporation moved to voluntarily dismiss their appeals on November 26 and 27, 2019. We granted both motions on November 27, 2019. Buesing also filed a *separate* motion, seeking to voluntarily dismiss the Jungerman Family Irrevocable Trust as an appellant. That motion was

---

[2] Section 512.020(2) provides that "[a]ny party to a suit aggrieved by any judgment of any trial court in any civil cause" "may take his or her appeal to a court having appellate jurisdiction from any . . . [o]rder refusing to revoke . . . an interlocutory order appointing a receiver." A circuit court's interlocutory order denying "a motion to revoke [a] receivership appointment is appealable and need not be denominated a judgment prior to the appeal being taken." *Meadowfresh Solutions USA, LLC v. Maple Grove Farms, LLC*, 578 S.W.3d 758, 762 (Mo. 2019) (overruling *Spiece v. Garland*, 197 S.W.3d 594 (Mo. 2006)).

7

taken with the case. The Jungerman Family Irrevocable Trust is not an appellant in this case, and indeed was not even named as a defendant until after the orders at issue in this appeal were entered. *See* note 1, above. Moreover, we understand that there is currently a dispute in the circuit court as to whether Buesing, David Jungerman, or both, are the proper trustees entitled to act on behalf of the Jungerman Family Irrevocable Trust. Jungerman's counsel confirmed at oral argument that the issues raised by the appellants in this case do not depend on the particular identity or circumstances of any of the appealing parties; so long as one appellant remains, the presence (or absence) of the other appellants does not affect the issues we must decide. Given these circumstances, and given that we are affirming the circuit court's relevant orders, Buesing's motion to voluntarily dismiss the appeal of the Jungerman Family Irrevocable Trust is denied as moot.

### Standard of Review

"The power to appoint a receiver is within the sound discretion of the trial court." *Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd.*, 165 S.W.3d 141, 146 (Mo. 2005) (citation omitted). "An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Dieser v. St. Anthony's Med. Ctr.*, 498 S.W.3d 419, 436 (Mo. 2016) (citation and internal quotation marks omitted).

### Analysis

Jungerman raises two Points on appeal. In the first, he argues that the circuit court erred in denying his motion to revoke the order appointing a receiver, because he was not given proper notice under the Missouri Commercial

8

Receivership Act, § 515.500 *et seq.*,[3] and because he did not have a meaningful opportunity to be heard before the receiver's appointment. In his second Point, Jungerman contends that Reigel failed to demonstrate that she had a legal right to the appointment of a receiver, because her underlying wrongful death claims had not been reduced to judgment.

## I.

Jungerman makes two distinct arguments in his first Point. First, he contends that the appointment of a receiver was unlawful because he did not receive "[a]t least seven days' notice of any application for the appointment of a receiver," as required by the Commercial Receivership Act. § 515.510.3. Second, Jungerman argues that the appointment of a receiver violated his due process rights because he did not have a meaningful opportunity to be heard before the receiver was appointed.

Jungerman's opening Brief notes that "[t]he trial court's order appointing the receiver in this case cited three different authorities as the basis for its power to appoint the receiver": the Missouri Commercial Receivership Act; the Uniform Fraudulent Transfer Act, § 428.005 *et seq.*; and Supreme Court Rule 68.02.

The Fraudulent Transfer Act does not contain the seven-day notice requirement on which Jungerman relies. He argues, however, that the Fraudulent Transfer Act is inapplicable because it "merely provides a receiver as a possible remedy for a fraudulent transfer claim that has been decided on the merits in favor of a creditor." We disagree.

"The [Fraudulent Transfer Act] created a statutory cause of action that provided specific equitable remedies for creditors invoking its sections." *Lewellen v.*

---

[3]     Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated through the 2018 Cumulative Supplement.

9

*Universal Underwriters Ins. Co.*, 574 S.W.3d 251, 266 (Mo. App. W.D. 2019).

Section 428.024.1 provides:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer or incurred the obligation:
>
>> (1)　With actual intent to hinder, delay, or defraud any creditor of the debtor.

Section 428.039 specifies the remedies available in actions asserting claims under the Fraudulent Transfer Act:

> 1.　In an action for relief against a transfer or obligation under sections 428.005 to 428.059, a creditor, subject to the limitations in section 428.044, may obtain:
>
>> (1)　Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
>>
>> (2)　An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable laws of this state;
>>
>> (3)　Subject to applicable principles of equity and in accordance with applicable rules of civil procedure,
>>
>>> (a)　An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
>>>
>>> (b)　***Appointment of a receiver to take charge of the asset transferred or of other property of the transferee***; or
>>>
>>> (c)　Any other relief the circumstances may require.
>
> 2.　If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

(Emphasis added.)

Section 428.039.1(3)(b) does not merely authorize the appointment of a receiver as part of a final judgment on a fraudulent transfer claim. Instead, it

10

authorizes the appointment of a receiver as an interim remedy during the pendency of litigation on a fraudulent transfer claim. Section 428.054 of the Fraudulent Transfer Act provides that:

> Unless displaced by the provisions of sections 428.005 to 428.059, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement its provisions.

"The UFTA therefore specifically incorporates pre-existing legal and equitable principles related to the law of fraudulent conveyances insofar as those principles do not conflict with the provisions of the UFTA." *Volk Constr. Co. v. Wilmescherr Drusch Roofing Co.*, 58 S.W.3d 897, 900 (Mo. App. E.D. 2001).

Prior to the enactment of the Fraudulent Transfer Act, Missouri courts had recognized that a court could appoint a receiver during the pendency of litigation where there was a likelihood of dissipation of assets during the pendency of the litigation, and a reasonable likelihood that the plaintiff would succeed on the merits.

> [W]here property not otherwise in the custody of the law is involved in litigation which has for its primary purpose some character of distinct equitable relief, and it appears that through fraud, mismanagement, misconduct, or otherwise, there is a likelihood that without the interposition of the court the property will be squandered, wasted, misappropriated, or unlawfully diverted, then the court will be authorized to appoint a receiver to take charge of and hold the property pending the litigation, if there is a reasonable probability that the plaintiff will ultimately succeed in securing the relief which he seeks in the suit in which the receivership is asked.

*Robinson v. Nick*, 136 S.W.2d 374, 385 (Mo. App. 1940).

Applying the same Uniform Fraudulent Transfer Act provisions adopted in Missouri, courts in other jurisdictions have held that the remedies authorized by

11

subsection (3) of § 428.039.1 – including appointment of a receiver and injunctive relief – may be awarded during the pendency of the fraudulent transfer litigation.[4]

The official Comment to § 7 of the Uniform Fraudulent Transfer Act provides further support for our conclusion that the Act authorizes appointment of a receiver during the pendency of fraudulent transfer litigation. "[W]hen construing a model or uniform act such as the UFTA, Missouri courts are to assume that statute was enacted with the intention of adopting the accompanying interpretations placed thereon by the drafters of the model or uniform act." *Volk*, 58 S.W.3d at 900 n.2 (citation and internal quotation marks omitted). Comment 7 cites approvingly to a case which expressly holds that a fraudulent conveyance plaintiff may "seek the appointment of a receiver *pendente lite* to take charge of the real and personal property alleged to have been fraudulently conveyed." *Matthews v. Schusheim*, 235 N.Y.S.2d 973, 976 (N.Y. Sup. 1962), *rev'd*, 236 N.Y.S.2d 407 (App. Div. 1962),[5] cited at 7A UNIFORM LAWS ANNOTATED Part II at 491 (2017); *see also* John E. Sullivan III, *Future Creditors and Fraudulent Transfers*, 22 DEL. J. CORP. L. 955, 961 & n.19

---

[4] *See, e.g., Janvey v. Alguire*, 647 F.3d 585, 602–03 (5th Cir. 2011) (Texas law; holding that Uniform Fraudulent Transfer Act authorized issuance of preliminary injunction barring disposition of property); *Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 739 (N.D. Tex. 2008) ("[T]he Court holds that [Texas' Uniform Fraudulent Transfer Act] provides creditors—secured and unsecured alike—with the substantive right to seek quickly the appointment of a receiver to secure their interests and prevent further fraudulent conduct without first enduring the long delay necessary to reduce their claims to judgment."); *Robinson v. Coughlin*, 830 A.2d 1114, 1120 (Conn. 2003) ("[The] UFTA provides protection by allowing creditors to obtain prejudgment relief upon a showing of probable cause."); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 608-10 (Tex. App. 2002) (holding that Texas' Uniform Fraudulent Transfer Act authorized issuance of temporary injunction barring foreclosure of property subject to fraudulent conveyance claim).

[5] The Appellate Division reversed "in the exercise of discretion," on the condition that the defendant post a bond sufficient to satisfy any judgment the plaintiff ultimately received. 236 N.Y.S.2d at 408. The court concluded that, "[i]n our opinion, on the record presented, the furnishing of an undertaking in the amount specified will adequately protect plaintiff's rights. In the peculiar circumstances of this case, a receivership should not be required in the event the undertaking be furnished." *Id.* The Appellate Division's disposition did not question the Supreme Court's conclusion that the relevant statutes authorized the appointment of a receiver *pendente lite*.

(1997) (noting that the Uniform Fraudulent Transfer Act authorizes a creditor to "obtain a variety of equitable pre-judgment relief," and "allows a court to appoint a receiver, issue injunctions (including a freeze order against the transferee and transferor), order pre-judgment attachment on the property, or fashion any other provisional remedies as the circumstances of the case may require").

Jungerman cites to a series of cases to support his claim that the Fraudulent Transfer Act only authorizes the appointment of a receiver following the entry of final judgment on a fraudulent transfer claim. None of the cases he cites address whether interim relief is available under § 428.039.1(3), however. Instead, those cases address remedy issues unrelated to the argument Jungerman makes here. *See Lewellen*, 574 S.W.3d at 267–68 (holding that "[t]he remedies of the UFTA are equitable in nature and plainly do not include a suit against a third party based on the co-conspirator theory of civil liability for legal remedies"); *May v. Williams*, 531 S.W.3d 576, 586 (Mo. App. W.D. 2017) (holding that a money judgment against the alleged transferees of fraudulent conveyances, based on a breach of contract by the transferor, was not among the remedies authorized by § 428.039); *Fisher v. Brancato*, 174 S.W.3d 82, 87 (Mo. App. E.D. 2005) (successful Fraudulent Transfer Act plaintiff may recover on underlying judgment against assets which were returned to the judgment debtor after a fraudulent transfer was set aside).

Jungerman also cites to *Mark VII, Inc. v. Barthol*, 926 S.W.2d 128, 131 (Mo. App. W.D. 1996). *Mark VII* is not relevant to whether the remedies contemplated by the Fraudulent Transfer Act are available prejudgment, because the creditors in *Mark VII* did not assert a fraudulent transfer claim under the Act. *Id.* at 131–32; *see RehabCare Group E., Inc. v. Stratford Health Care Props., LLC*, No. 14-0886-CV-W-FJG, 2016 WL 11469771, at *3–4 (W.D. Mo. Feb. 8, 2016) (noting that Mark VII "fails to even mention MUFTA, possibly because the facts giving rise to the claim

13

dealt with in that case occurred in 1989, before the Missouri legislature passed MUFTA").

Jungerman's sole argument in Point I concerning the applicability of the Fraudulent Transfer Act is his claim that the Act does not authorize the appointment of a receiver as an interim remedy. That argument is mistaken. We therefore conclude that the Fraudulent Transfer Act authorized the circuit court's appointment of a receiver in this case. The Act does not contain the seven-day notice requirement on which Jungerman's first Point depends. We therefore reject Jungerman's argument that the appointment of a receiver was void because he was purportedly not provided with seven days' advance notice before the receiver was appointed.[6]

Jungerman also makes a constitutional due process argument, contending that he was not given a meaningful opportunity to be heard before the receiver was appointed. Jungerman did not preserve this argument in the circuit court, however. "To properly raise a constitutional challenge, a party must: (1) raise the constitutional question at the first opportunity; (2) state with specificity the

---

[6]     Jungerman's opening Brief also points out that § 428.039.1(3) of the Fraudulent Transfer Act makes the appointment of a receiver "subject to . . . applicable rules of civil procedure." He then argues, without citation, that the Commercial Receivership Act provides the "applicable rules of civil procedure." Generally, the "rules of civil procedure" are understood to refer to Rules 41 through 103 promulgated by the Missouri Supreme Court to govern civil actions in the circuit courts. Jungerman's abbreviated argument does not persuade us otherwise. And his claim that the Commercial Receivership Act somehow amended Rule 68.02 (which is itself a "rule of civil procedure") runs headlong into the principle that, to amend or annul a procedural rule promulgated by the Supreme Court, a statute "must refer expressly to the rule and be limited to the purpose of amending or annulling" it. *State ex rel. Collector of Winchester v. Jamison*, 357 S.W.3d 589, 592 (Mo. 2012) (citation and internal quotation marks omitted). Apart from arguing that the Commercial Receivership Act provides the "applicable rules of civil procedure" within the meaning of § 428.039.1(3), Jungerman makes no argument that the procedures specified in the Commercial Receivership Act should be employed to supplement the provisions of the Fraudulent Transfer Act. *Cf. State ex rel. Praxair, Inc. v. Mo. Pub. Serv. Comm'n*, 344 S.W.3d 178, 184 (Mo. 2011) ("To the extent that there are matters not addressed by the PSC statutes and the administrative rules adopted by the PSC pursuant to section 386.410, [the Missouri Administrative Procedure Act] operates to fill gaps not addressed within the PSC statutes." (citation and internal quotation marks omitted)).

constitutional provision on which the challenge rests; (3) set forth facts showing the violation; and (4) preserve the question throughout the proceedings for appellate review." *Med. Plaza One, LLC v. Davis*, 552 S.W.3d 143, 156 (Mo. App. W.D. 2018) (citation and internal quotation marks omitted). Here, Jungerman failed to raise a constitutional claim in the memorandum in support of his motion to revoke the appointment of the receiver, and failed to argue at the October 12 hearing that the appointment of a receiver violated his due process notice rights.[7] This constitutional issue was waived.

Even if this argument was preserved, it is without merit. Jungerman was given notice on multiple occasions that Riegel was seeking the appointment of a receiver, and had multiple opportunities to be heard on that request. First, Riegel requested in her petition that a receiver be appointed. Then, the parties argued at the August 22 hearing about the appointment of a receiver. At the hearing, Jungerman's counsel requested "the opportunity to brief the Court on the receivership issue," and that request was granted. The court did not enter an order appointing a receiver until August 29, 2018, after receiving Jungerman's briefing and oral argument concerning the propriety of such an appointment. Further, Jungerman was able to file a motion to revoke the order appointing the receiver, and the court conducted a further hearing on that motion before denying it. Jungerman was given a meaningful opportunity to be heard concerning the appointment of a receiver.

---

[7] Jungerman's criminal counsel entered a limited appearance at the October 12 hearing, and argued that Jungerman's due process rights were violated because the original receiver was a member of the Kansas City Board of Police Commissioners. The due process argument made by Jungerman's criminal-defense attorney is wholly distinct from the notice argument he now raises on appeal.

## II.

In his second Point, Jungerman argues that there was no legal basis to appoint a receiver. He contends that Riegel was not entitled to seek appointment of a receiver because she does not have a right or title to Jungerman's property, because her wrongful death claim has not been reduced to judgment.

As noted above, the circuit court relied on both the Commercial Receivership Act and the Fraudulent Transfer Act (as well as Rule 68.02) to justify its order appointing a receiver. After arguing that Riegel did not have a right to appointment of a receiver under the Commercial Receivership Act, Jungerman's brief continues:

> The UFTA does not change any of this. It, too, requires the plaintiff to establish that he is a "creditor" of the defendant. § 428.024.1, R.S.Mo. It, too, defines a "creditor" as "a person who has a claim." § 428.009(4), R.S.Mo. It defines a "claim" as "a right to payment . . . ." *Id.* at (3). So, even there, in order to be a "creditor" and obtain the relief of a receivership, the plaintiff must prevail on its underlying claim and establish its right to payment.

Jungerman's argument relies on a truncated – and misleading – quotation of the relevant statutory provisions. Jungerman's brief asserts that the Fraudulent Transfer Act defines a "claim" as a "right to payment . . .," and continues by arguing that "the plaintiff must [therefore] prevail on its underlying claim" in order to establish a sufficient "right to payment." What Jungerman's brief conceals by an ellipsis, however, is that the Act defines a "claim" to include

> a right to payment, ***whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured***.

§ 428.009(3) (emphasis added). The emphasized language – wholly omitted from Jungerman's opening and reply briefs – on its face establishes the fallacy of Jungerman's argument: the statute plainly defines individuals as "creditors" even if their claims against a debtor have not been reduced to judgment, and even if

16

those claims are unliquidated, contingent, and disputed. The fact that Riegel's wrongful death claim has not been litigated to final judgment does not prevent her from being a "creditor" possessing a "claim" within the meaning of the Fraudulent Transfer Act.

The Eastern District applied the plain language of the Fraudulent Transfer Act's definition of a "claim" in *Curtis v. James*, 459 S.W.3d 471 (Mo. App. E.D. 2015). *Curtis* held that, "under the plain language of the statute, a creditor is not required to obtain a judgment in order to pursue an action under the Act." *Id.* at 475. Acknowledging that there was "no Missouri precedent interpreting the definition of a 'claim' under the" Fraudulent Transfer Act, the Court examined caselaw from other jurisdictions. *Id.* at 475–76. It concluded that its "holding that a creditor is not required to obtain a judgment [on the underlying cause of action] before pursuing an action under the Act is consistent with the interpretation of other jurisdictions that a pending or threatened lawsuit is a 'claim' under the Uniform Fraudulent Transfer Act or similar state provisions." *Id.* (citing *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1335 (11th Cir. 2007); *United States v. Green*, 201 F.3d 251, 257 (3d Cir. 2000); *Bishop v. Patton*, 706 S.E.2d 634, 640 (Ga. 2011); *Baker v. Geist*, 321 A.2d 634, 636 (Pa. 1974); *Tolle v. Fenley*, 132 P.3d 63, 66 (Utah App. 2006)).[8]

If the plain language of the statute were not clear enough, the official Comments to the Uniform Fraudulent Transfer Act note on multiple occasions that

---

[8]     *See also, e.g., Oiye v. Fox*, 151 Cal. Rptr.3d 65, 82 (Cal. App. 2012) ("Certainly, for purposes of the Uniform Fraudulent Conveyance Act, a tort claimant before judgment is rendered is a 'creditor' within the meaning of Civil Code section 3439.01." (citation omitted)); *Bedwell v. Rucks*, 127 So.3d 533, 535 (Fla. App. 2012) ("Indeed, the Fraudulent Transfer Act does not even require that the creditor first obtain a judgment against the debtor for the underlying claim." (Citing *Friedman v. Heart Inst. of Port St. Lucie, Inc.*, 863 So.2d 189, 193 (Fla. 2003))); *Sargeant v. Al Saleh*, 512 S.W.3d 399, 414 (Tex. App. 2016) ("Under [Texas' Uniform Fraudulent Transfer Act], the claim can be equitable and need not be matured or reduced to judgment." (Citation omitted)).

17

a "claim" need not have been reduced to judgment. Thus, the "Prefatory Note" to the Uniform Act notes that "[a]n important reform effected by" the Act's predecessor, and retained in the Uniform Fraudulent Transfer Act, "was the elimination of any requirement that a creditor have obtained a judgment or execution returned unsatisfied before bringing an action to avoid a transfer as fraudulent." 7A UNIFORM LAWS ANNOTATED Part II at 247 (2017); *see also id.* at 260 (Comment 4 to § 1; "the holder of an unliquidated tort claim or a contingent claim may be a creditor protected by this Act"); *id.* at 491 (Comment 4 to § 7; "a creditor is not required to obtain a judgment against the debtor-transferor or to have a matured claim in order to proceed under" the Act's remedial provisions).

We therefore reject Jungerman's argument that Riegel was not entitled to proceed under the Fraudulent Transfer Act because she had not yet prevailed on her underlying wrongful death claim.

We recognize that § 428.039.1(3) states that the remedies authorized by that subsection are "[s]ubject to applicable principles of equity." Under common-law principles,

> [i]t is essential to the appointment of a receiver over property, funds or assets, that the applicant show either that he has a clear right or apparent right or title in or to the property itself, that he has some lien upon it, or that the property constitutes a special fund to which he has a right to resort for the satisfaction of his claim. That is to say, the property itself must be involved directly, not incidentally. Without such a showing the property is not involved in the proceeding, and the court is without power to appoint a receiver at any stage of the controversy.

*Camden Cnty. ex rel. Camden Cnty. Comm'n v. Lake of the Ozarks Council of Local Govts.*, 282 S.W.3d 850, 859 (Mo. App. S.D. 2009) (quoting *Kansas City v. Markham*, 99 S.W.2d 28, 30 (Mo. 1936)). Although not fully developed in Jungerman's briefing, at argument his counsel argued that this requirement of a right or title to specific property is one of the "principles of equity" which must be satisfied before a

18

receiver is appointed under the Fraudulent Transfer Act. We disagree. The Act provides that a receiver may be appointed "to take charge of the asset transferred *or of other property of the transferee*." § 428.039.1(3)(b) (emphasis added). Plainly, by permitting a receiver to be appointed over property of a transferee beyond the property actually transferred by the debtor, the Act enlarges the right to obtain a receiver beyond any specific property in which the plaintiff may have an interest.

## Conclusion

We recognize that the appointment of a receiver over a civil defendant's property, during the pendency of litigation, is an extraordinary remedy which should be employed only in highly unusual and compelling circumstances. The circuit court justifiably concluded that this case presents such extraordinary circumstances. The arguments raised by Jungerman on appeal fail to establish any abuse of discretion or error of law by the circuit court. We accordingly affirm the circuit court's denial of Jungerman's motion to vacate the order appointing a receiver.

_____
Alok Ahuja, Judge

All concur.